NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0068n.06

No. 19-6464

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Feb 03, 2021
DEBORAH S. HUNT, Clerk

|   |   |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff-Appellee, | ) |
|  | ) |
| v. | ) |
|  | ) |
| RAYMOND D. HUNTER, | ) |
| Defendant-Appellant. | ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE

OPINION

BEFORE:     BATCHELDER, STRANCH, and NALBANDIAN, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.**  Raymond D. Hunter is a person living with schizophrenia whose symptoms can be effectively treated with medication.  In 2019, he was convicted of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1).  Hunter moved for a downward variance, citing his schizophrenia and its responsiveness to pharmaceutical treatment as a mitigating factor.  The district court denied his motion and sentenced him to 78 months' incarceration, in the middle of his Guidelines range.  The Court acknowledged that Hunter was unlikely to reoffend if he received treatment but then agreed with the Government that "the only way we know we can protect the public is to put him in jail."

Hunter now challenges the procedural reasonableness of his sentence, arguing that the district court erred by relying on its prediction of the future symptoms of his schizophrenia to increase his sentence.  We **AFFIRM**.

## I.    BACKGROUND

### A.    Hunter's Schizophrenia and Treatment

In 2008, when Hunter was in college, his schizophrenia began to manifest. He was diagnosed and obtained mental health treatment at a local hospital.[1] Prior to the onset of his symptoms, Hunter was convicted of two misdemeanors, for possession of drug paraphernalia and driving on a revoked license, and received suspended sentences and small fines for both. But after his schizophrenia intensified, without medication, he was convicted of three robberies at businesses in Chattanooga beginning in 2013. In the first, he used what was presumably a BB gun to steal money and a car, but later returned valuable items that had not been in the car when it was recovered; in the second, he again used a presumed BB gun to steal money. In the third, which led to the arrest related to this case, he robbed two people of their cell phones at gunpoint and then returned the phones after one chased and confronted him. In all three incidents, no one was hurt. At sentencing in this case, Hunter's counsel described the third robbery as a "weird, weird scenario," and the district court agreed that "there are some oddities about what [Hunter was] doing."

In November 2017, Hunter was arrested for the third robbery and was detained pretrial in the Hamilton County Jail. Jail employees called the hospital's crisis unit in April 2018 to attend to him. Two days later, Hunter was ordered committed for a mental evaluation and transported to the Federal Medical Center. Forensic psychologists there diagnosed him with "Unspecified

---

[1] One common effect of schizophrenia is nonadherence to medication treatments. Dawn I. Velligan et al., *Why Do Psychiatric Patients Stop Antipsychotic Medication? A Systematic Review of Reasons for Nonadherence to Medication in Patients with Serious Mental Illness*, 11 Patient Preference & Adherence 449, 450–51 (2017) (reviewing 36 studies analyzing nonadherence, mostly "in patients with schizophrenia or schizophrenia-like disorders"). "Attitude toward medication is a complex and multidimensional variable." *Id.* at 466; *see also* Peter M. Haddad et al., *Nonadherence with Antipsychotic Medication in Schizophrenia: Challenges and Management Strategies*, 5 Patient Related Outcome Measures 43, 49 (2014) ("Poor adherence cannot simply be regarded as 'difficult' behavior . . . ; rather, it can result from a range of factors that encompass the illness, medication, and organization of services, plus attributes of the clinician, patient, and caregivers. As a result, improving adherence often requires a range of interventions.").

Schizophrenia Spectrum and Other Psychotic Disorder." On the grounds the doctors identified, Hunter's counsel and the Government jointly moved the district court to find Hunter incompetent to enter a plea or stand trial and to order him committed "for treatment for restoration to competency" under 18 U.S.C. § 4241(d). The district court granted the motion. Hunter then entered treatment at the FMC, where facility officials convened an administrative hearing and decided to commence medication.

Over the next two months, Hunter was regularly given medication. After the injections, "Hunter's mental status improved significantly and was generally consistent for the remainder of the evaluation period."[2] Ultimately, the forensic psychologists diagnosed Hunter with schizophrenia "in full remission" as "currently treated with medication" and deemed him competent to understand the nature and consequences of the proceedings against him.

### B. Proceedings in the District Court

Hunter was transported back to the Eastern District of Tennessee, where he entered a guilty plea on June 19, 2019. Prior to sentencing, the presentence report determined his Guidelines range to be 70 to 87 months' incarceration; neither Hunter nor the Government disagreed. Hunter filed a motion asking the district court to vary downward from that range, contending that because Hunter's schizophrenia drove his criminal conduct, the fact that its symptoms could be effectively treated by medication meant he was unlikely to reoffend. "[I]f Mr. Hunter does not seek medication and treatment upon release," the motion stated, "he will almost surely reoffend." But it also maintained that "no amount of jail time is going to ensure that" Hunter would voluntarily seek that treatment, and asserted that "[t]he best method of insuring medicine compliance is monitoring which can be done on supervised release."

---

[2] The effects of the medication typically take a week or two to appear and may take up to three months to achieve their full strength.

At sentencing, Hunter summarized the motion's arguments, and the district court reviewed the details of his prior convictions. The Government stated that it "certainly sympathize[d] with [Hunter's] plight," and that Hunter's counsel "ma[de] some good points about medicated versus not medicated." But, the Government continued, "[t]he problem is, when [Hunter is] not medicated, he's a danger," and "the only way we know we can protect the public is to put him in jail." The Government then requested a sentence at the top of Hunter's Guidelines range.

The district court sentenced Hunter to 78 months' incarceration, explaining its reasoning as follows:

> I have reviewed the documentation that . . . I've been provided in this case. I've looked at the motion . . . . I looked at the government's response. I think you're both right, I really do. I believe sincerely that . . . if we could somehow figure out the combination to have [Hunter] make better decisions about taking care of himself and his mental issues, that he wouldn't be here today. But we haven't figured out how to do that. Even when he is incarcerated, it's maybe not impossible, but it's really difficult, even in incarceration, to get him to accept the treatment that doctors have provided for him.
>
> So I'm stuck with a case in which I know Mr. Hunter wouldn't probably do these things if he were more balanced and . . . thinking more clearly, but at the same time, . . . to say he's intentional, it would be an understatement. He's intentional . . . about refusing to be treated, to receive treatment, to take this seriously.
>
> And, honestly, all these factors -- I'll go through them briefly in a minute, but I do believe it all comes down to protection of public, because that's the only thing that I can see that I can change here or have much of an impact on. Mr. Hunter's mental issues make me very pessimistic about having any real effect as far as specific deterrence. I don't see a great value in general deterrence in this case.
>
> . . . .
>
> . . . And with regard to the nature and circumstances of this offense, I don't disagree that this is worse than your average possession case; but, even so, it comes down to protection of the public. Mr. Hunter . . . does represent a danger to the community, to himself. And as his disease progresses without treatment, I have very, very strong fears that it's only going to get worse for him and the people he comes in contact with. I believe that a [G]uidelines sentence is

appropriate, and will reflect the seriousness of this offense, provide for just punishment, and encourage respect for the law.[3]

After the district court pronounced its sentence, it posed a key question to the parties, but what exactly happened next is unclear from the transcript:[4]

> Does either party have any objections to the sentence just pronounced . . . that you haven't already raised?
>
> [The Government]:  No, sir.
>
> THE COURT:  Do you want to take a minute, [Hunter's counsel], or . . .
>
> DEPUTY UNITED STATES MARSHAL:  Ready?
>
> THE COURT:  I need to advise him about his appeal rights.
>
> DEPUTY UNITED STATES MARSHAL:  Okay.  Do his appeal rights.
>
> THE COURT:  Mr. Hunter, you need to listen to me.

After explaining Hunter's right to appeal, the court asked the parties if there was "anything else we need to resolve in this case," and both replied that there was not.

Hunter timely appealed the district court's judgment.

## II.    ANALYSIS

### A.    Standard of Review

"Sentences must be both procedurally and substantively reasonable," and we generally review a sentence's reasonableness in both regards for abuse of discretion.  *United States v. Kamper*, 748 F.3d 728, 739 (6th Cir. 2014); *see also Gall v. United States*, 552 U.S. 38 (2007). But when the district court asks what is known as the "*Bostic* question," inviting objections to the sentence that were not previously raised, and the relevant party does not object, we review

---

[3] The district court referred as well to Hunter's having "absconded . . . fairly recently" and to "other issues in his history that make me believe that a [G]uidelines sentence is the appropriate sentence."  It did not elaborate, though the former mention seems to allude to Hunter's failing to report to the probation office after his first two robberies.
[4] Hunter suggests that "it appears that some sort of commotion or other interruption occurred."

any procedural error committed during the sentencing itself for plain error instead.[5]  *United States v. Simmons*, 587 F.3d 348, 354 (6th Cir. 2009) (citing *United States v. Bostic*, 371 F.3d 865, 872–73 (6th Cir. 2004)); *United States v. Vonner*, 516 F.3d 382, 390–91 (6th Cir. 2008) (en banc).  "The point of the question is not to require counsel to repeat objections."  *Vonner*, 516 F.3d at 390.  Instead, it is meant "to give counsel one last chance to preserve objections for appeal that counsel has not yet seen fit to raise or has not yet had an opportunity to raise," often "clarifications about the proposed sentence [the court] just announced."  *Id.*

Importantly, though, even when the district court asks the *Bostic* question, if counsel is not able to respond, neither "the requirements, nor the spirit, of *Bostic*" are satisfied.  *United States v. Caper*, 571 F. App'x 456, 460 (6th Cir. 2014). We have typically emphasized this point when considering situations in which the district court cut off or otherwise prevented counsel from fully responding to the *Bostic* question.  *See, e.g.*, *id.* at 459–60; *United States v. Williams*, 97 F. App'x 613, 614 (6th Cir. 2004).  But the logic applies with equal force in any situation when counsel is rendered unable to answer;  after all, *Bostic* itself speaks of a "meaningful opportunity to object."  371 F.3d at 872, 873 n.6.

Here, the transcript shows that Hunter's counsel had no chance to respond before the court moved on to explaining Hunter's right to appeal.  The court did then ask both parties if there was anything left to resolve, and Hunter's counsel said there was not.  True, Hunter's counsel potentially could have renewed his objection, as described in the motion for variance previously filed with the court and in his earlier remarks at the hearing.  But at the same time, the

---

[5] To establish that the district court committed plain error, Hunter would have to show that there was "(1) error (2) that was 'obvious or clear,' (3) that 'affected [his] substantial rights[,]' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'"  *Vonner*, 516 F.3d at 386 (quoting *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006)).

district court's second, general question is precisely the kind that we have held does not alone satisfy *Bostic*. *See United States v. Clark*, 469 F.3d 568, 570–71 (6th Cir. 2006).

We can put this issue aside, however, because Hunter sufficiently stated the grounds for his objection to the sentence prior to the sentencing hearing in his motion for variance. Hunter "does not argue that the district court committed procedural error by failing even to consider his arguments; such an objection must be preserved by an objection after the sentencing because it 'cannot be "preserved" in advance of a sentencing event that has yet to occur.'" *Kamper*, 748 F.3d at 740 (quoting *United States v. Lamb*, 431 F. App'x 421, 424 (6th Cir. 2011)). Raising an issue both in a written filing before the sentencing hearing and during the hearing itself preserves the objection when the defendant is "objecting to the discretionary rejection of the request for a variance." *Lamb*, 431 F. App'x at 424. Hunter did just that, so "[n]o explicit objection after the *Bostic* inquiry was required here because [he] had already argued and the district court had explicitly addressed the issue." *Kamper*, 748 F.3d at 740. We have held that "it is unnecessary for a party to repeat previously made objections in order to secure the lower standard of review on appeal," and that is so here. *Simmons*, 587 F.3d at 355; *see also Vonner*, 516 F.3d at 390 ("[N]either the defense nor the government, in response to the *Bostic* question, has any obligation to raise objections already made.").

Therefore, we review the district court's judgment, including its decision to deny Hunter's motion by not varying downward from the Guidelines range, for abuse of discretion. "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d

452, 457 (6th Cir. 2020) (quoting *Zehentbauer Fam. Land, LP v. Chesapeake Expl., L.L.C.*, 935 F.3d 496, 502 (6th Cir. 2019)).

#### B.  Procedural Reasonableness

Next, the parties dispute whether Hunter is challenging the procedural or substantive reasonableness of his sentence.  Hunter characterizes his arguments as addressing the former; the Government responds that by "faulting the district court for denying his motion for variance," he is actually addressing the latter.  We agree with Hunter:  the core of his argument is that the district court primarily if not exclusively considered the possible future manifestations of his schizophrenia and the potential of his nonadherence to medication when arriving at his sentence, which Hunter maintains are impermissible factors.[6]  This contention directly implicates procedural rather than substantive reasonableness.[7]  *See Gall*, 552 U.S. at 51; *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018) ("The point [of substantive unreasonableness] is not that the district court failed to consider a factor or considered an inappropriate factor; that's the job of procedural unreasonableness.").  And while we presume sentences within the Guidelines range to be substantively reasonable, no such presumption applies to their procedural reasonableness.  *United States v. Cabrera*, 811 F.3d 801, 808 (6th Cir. 2016).

We "look[] to the entire context and record" when reviewing a district court's sentencing determination.  *United States v. Madden*, 515 F.3d 601, 612 (6th Cir. 2008).  District courts may make "reasonable inferences" from the record but may not engage in "unreasonable speculation."  *United States v. Parrish*, 915 F.3d 1043, 1048 (6th Cir. 2019).  "[A] district court

---

[6] The factors sentencing courts should consider are listed in 18 U.S.C. § 3553(a); "the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need for the sentence imposed . . . to protect the public from further crimes of the defendant" are the most salient here.

[7] We note, however, that our cases have not spoken with one voice on this question and that we have described it as "ripe for en banc review."  *United States v. Fowler*, 956 F.3d 431, 440 n.1 (6th Cir. 2020) (collecting cases).  *But see United States v. Parrish*, 915 F.3d 1043, 1047–48 (6th Cir. 2019) (stating that *United States v. Cabrera*, 811 F.3d 801 (6th Cir. 2016), "settled the question" in favor of procedural reasonableness).

abuses its discretion when it considers an impermissible factor in sentencing," and if we determine that it has, "we must vacate and remand for resentencing." *United States v. Fowler*, 956 F.3d 431, 440 (6th Cir. 2020) (quoting *United States v. Van*, 541 F. App'x 592, 596 (6th Cir. 2013)).

Congress and the Sentencing Commission have expressly addressed the import of mental disabilities at sentencing. In a policy statement, the Sentencing Guidelines provide that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." USSG § 5H1.3. "[A] downward departure may be appropriate to accomplish a specific treatment purpose." *Id.* Meanwhile, "there exists a statute, 18 U.S.C. § 4246, directly designed to forestall [a person's potential danger to the community] through continued commitment after completion of the sentence." *United States v. Moses*, 106 F.3d 1273, 1280 (6th Cir. 1997). Instituting commitment proceedings stays the person's release pending a hearing and decision, and if the court finds by clear and convincing evidence that the person continues to pose a danger, the statute provides for continued confinement or conditional release (including with a requirement to continue taking medication). *Id.* at 1276, 1280. Companion statutes allow for commitment to a mental health facility in place of incarceration or transfer from a prison to a mental health facility during the prison sentence. 18 U.S.C. §§ 4244–4245. Meanwhile, sentencing courts are directed to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

In light of these provisions, we have previously addressed the permissible ways in which sentencing courts may consider mental disabilities. In *United States v. Owen*, 940 F.3d 308, 317

(6th Cir. 2019), for instance, we stated that "[w]hile a district court should, in the sentencing context, give consideration to a defendant's mental illness, the court is not required to grant a defendant's motion for a downward variance whenever a defendant suffers from such an illness." We held in *Moses* that "under the relevant statutes and guidelines, the appropriate mechanism of public protection is a commitment proceeding under § 4246, rather than an extended criminal sentence." 106 F.3d at 1281. *Moses* involved an upward departure based on a finding of "extraordinary danger to the community" posed by the defendant's schizophrenia and his "need for psychiatric treatment," and we have at times distinguished it on that basis. 106 F.3d at 1280; *see United States v. Tolbert*, 459 F. App'x 541, 547–48 (6th Cir. 2012).

Of our cases, *Tolbert* presents the closest analogue to this one. There, we addressed the matter of mental disability as an issue of substantive reasonableness, as Tolbert presented it that way. *Tolbert*, 459 F. App'x at 547–48. In a similar but not identical manner to Hunter, Tolbert—who the district court described as "suffer[ing] from depression, bipolar disorder, and other conditions that may make him more likely to act irrational[ly]"—argued that "his mental illness and violent propensities [were] so inseparably intertwined that when the district court justified its denial of his motion for a downward variance based on the need to protect the public, this was actually a decision to impose a greater sentence because of his mental health issues." *Id.* at 544, 547. Without extensive analysis, we stated that because Tolbert, unlike Moses, was neither "sentenced subject to an upward departure" nor "otherwise eligible to be released," *Moses* was "inapplicable." *Id.* at 548. So, when the district court treated Tolbert's mental disability as a mitigating factor and balanced it with the need to protect the public, it acted appropriately in determining that the latter "was paramount." *Id.* In similar cases, also analyzing substantive reasonableness, we have applied *Tolbert*'s reasoning. *Owen*, 940 F.3d at 317–18;

*United States v. Goode*, No. 19-4169, --- F. App'x ----, 2020 WL 6821694, at *2 (6th Cir. Nov. 20, 2020).

Section 3553(a), by requiring courts to consider "the nature and circumstances of the offense and the history and characteristics of the defendant," permits consideration of the connection between a particular mental disability and criminal conduct. USSG § 5H1.3 does the same. When a defendant presents evidence that he lives with a mental disability, the court may consider that evidence to the extent that it is relevant, just like any other type of evidence. But at the same time, the fact that Hunter was sentenced within his Guidelines range matters: *Moses* was specifically discussing the application of an upward departure under USSG § 5K2.14 when it prohibited "focusing on [the defendant's] future dangerousness" potentially resulting from his mental disability. *Moses*, 106 F.3d at 1278–79; *see Tolbert*, 459 F. App'x at 548. That is not the case here. And while we have described *Moses* as generally "prohibit[ing] the extension of a defendant's sentence based on the need for treatment for mental illness, even if that mental illness creates a potential danger of violent behavior," *United States v. Arnold*, 630 F. App'x 432, 438 (6th Cir. 2015), that blanket rule—though perhaps reasonable—is not *Moses*'s holding.[8]

Here, the district court did not engage in unreasonable speculation, and so did not abuse its discretion, by inferring from the record that Hunter's treatment nonadherence could be likely to recur. *See Parrish*, 915 F.3d at 1048. While potential of future dangerous behavior linked to mental disability cannot alone justify an upward departure, *see Moses*, 106 F.3d at 1278–79, the district court could take its view of that potential into account as a factor in its consideration of the sentence, including the motion for a downward variance. It is relevant to "the nature and circumstances of the offense," "the history and characteristics of the defendant," and the need to

---

[8] *Arnold* itself also involved an upward departure based on the need for treatment and so was a direct application of *Moses* in that respect. 630 F. App'x at 437–38.

"protect the public."  18 U.S.C. § 3553(a).  "Judges are not pharmacists or doctors," *United States v. Savinon-Acosta*, 232 F.3d 265, 268 (1st Cir. 2000), and so Hunter's point—that the district court's conclusion about his potential nonadherence to treatment is speculative—is well-taken.  But that does not render the conclusion impermissible altogether, *see Fowler*, 956 F.3d at 440, or ultimately represent an application of the wrong legal standard, a misapplication of the right one, or a clear error of judgment, *see Hicks*, 965 F.3d at 457.

## III.  CONCLUSION

This decision walks a fine line: while a district court sentences a defendant for his criminal conduct, not "because of his mental illness," *United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995),  a sentence may not punish a person merely for living with a mental disability. *See generally Robinson v. California*, 370 U.S. 660, 666–67 (1962) (holding that states cannot criminalize the "status" of substance addiction, just as they could not "make it a criminal offense for a person to be mentally ill").  This distinction is important as a matter of both principle and realism:  disparities in access to and availability of mental healthcare are well documented.  *See, e.g.*, Tammeka Swinson Evans et al., U.S. Dep't of Health & Hum. Servs., *Disparities within Serious Mental Illness* (2016), https://www.ncbi.nlm.nih.gov/books/NBK368427/.  Finally, in the context of determining sentences in cases like this one, district courts, the Government, and defendants alike must also recognize and appropriately apply statutory procedures that can lessen or even obviate any need to consider nonadherence to treatment.  *See* 18 U.S.C. § 4246.

Based on the record and for the reasons discussed above, we **AFFIRM** Hunter's sentence.